ATTACHMENT 1

# ATTACHMENT 1

# UNSWORN DECLARATION OF

# TIMOTHY A. DELONG

ATTACHMENT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MICHAEL HYATT** | ) | **CIVIL ACTION NO.: 2:22-cv-04004** |
| | ) | |
| **VERSUS** | ) | **JUDGE ELDON E. FALLON** |
| | ) | |
| **ABR LOGISTICS, LLC., THOMAS JOHNSON,** | ) | **MAGISTRATE KAREN W. ROBY** |
| **AND QBE UK LIMITED** | ) | |

### <u>UNSWORN DECLARATION OF TIMOTHY A. DELONG</u>

I am the CFO of Alabama Shipyard, LLC ("ASY") and have read the lawsuit and third-party claim filed in Michael Hyatt and ABR Logistics LLC, et al. ("ABR"), in Civil Action No. 2:22-cv-04004, in the United States District Court for the Eastern District of Louisiana.

I have been asked to declare regarding the Gaea 6, formerly known as the HERCULES 202, scraping project and the work of ASY regarding same as follows:

ASY operates a ship repair and a ship breaking and scraping business at its facility located on the Mobile River in Alabama;

ASY is not involved in any offshore exploration and production and, as part of its ship breaking business, purchased the Gaea 6 from Offshore Equipment LLC as scrap (*Attachment 1A*);

At all material times the Gaea 6 had been decommissioned from drilling as a jack-up rig, had its top drive, BOPs and Drill strings removed and was not capable of exploring for oil and gas when ASY purchased it as scrap;

At all material times the Gaea 6 was not self-propelled and had no operational navigation equipment onboard;

At all material times the Gaea 6 was cold stacked in South Timbalier Block 32 waiting to be "dead towed" to the ASY facility in Mobile, Alabama to be dismantled and cut into scrap;

Michael Hyatt was employed at the ASY shipyard as a crane operator and rigger

supervisor;

On October 20, 2021, Michael Hyatt was assigned to board the Gaea 6 to operate its crane in order to move personnel and materials so that the Gaea 6 could be brought to the ASY shipyard for dismantling;

ABR Logistics, LLC was hired to transport Michael Hyatt to the Gaea 6 location on the day of the incident; and

Following the incident of October 20, 2021, Michael Hyatt was paid benefits under the LHWCA and has since entered into a formal settlement of those LHWCA claims with ASY.

I am of legal age and sound mind and understand that I execute this declaration under the penalty of perjury.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _29_ day of _August_ , 2023.


_____
Timothy A. DeLong,
**CFO of Alabama Shipyard, LLC**

2

#101567624v2

# ATTACHMENT 1A

## PURCHASE SALE AGREEMENT

## OF GAEA 6

ATTACHMENT 1A

## RIG PURCHASE AND SALE AGREEMENT

This Rig Purchase and Sale Agreement ("Agreement") is made as of the 7th day of May 2021 ("Effective Date"), between Offshore Equipment LLC, a Texas limited liability company ("Seller"), and Alabama Shipyard, LLC, a Delaware limited liability company ("Buyer"). Buyer and Seller may each be individually referred to as a "Party" and collectively as the "Parties" throughout this Agreement.

### RECITALS

A.         Seller is the owner of certain mobile offshore drilling units known as the GAEA 3 (ex-Hercules 204 IMO 8755455) and GAEA 6 (ex-Hercules 202 IMO 8752908) (each a "Drilling Unit" or collectively the "Drilling Units").

B.         Seller desires to sell the Drilling Units to Buyer, with all of their equipment, fixtures, furniture, supplies, tools, spare parts, materials, substances, and any other items located on board the Drilling Unit as of the date of inspection (May 6, 2021), except any top drives, BOPs, Drillstrings, and third party owned equipment such as cementing units and certain instrumentation that may currently be onboard the Drilling Units will remain the property of Seller or third parties; otherwise, Seller must provide a list of any other equipment removed or to be removed at its cost prior to the execution of this Rig Purchase and Sale Agreement, and Buyer desires to purchase the Drilling Units from Seller for the sole purpose of scrapping, recycling and otherwise disposing of the Drilling Units upon the terms and conditions set forth herein.

### AGREEMENT

Seller and Buyer agree as follows:

1.         Purchase and Sale. Seller hereby agrees to sell to Buyer, and Buyer agrees to buy from Seller, subject to the terms and conditions stated herein, the Drilling Units.

2.         Purchase Price. The purchase price for the Drilling Units is seven hundred twenty-seven thousand five hundred eighty and no/100 Dollars ($727,580) ("Purchase Price").

(a)    At Closing, Buyer will pay Seller by wire transfer of immediately available funds the Purchase Price.

(b)    Seller shall bear (i) all taxes that relate to the ownership, operation or storage of the Drilling Units prior to the Closing Date and (ii) all applicable taxes assessed against Seller on account of the sale or transfer of the Drilling Units to Buyer, including taxes on Seller's capital gain (if any).

(c)    Any taxes, fees and expenses in connection with the purchase and registration under the Buyer's flag shall be for the Buyer's account, whereas similar charges in connection with the closing of the Seller's registry shall be for the Seller's account.



(d)     Buyer shall bear (i) all taxes that relate to the ownership, operation or storage of the Drilling Units after the Closing Date and (ii) all applicable taxes which are assessed on account of or in connection with the purchase of the Drilling Units from Seller, including all sales, value added, transfer, documentary, stamp, gross receipts, license, registration, conveyance, excise and other similar taxes and fees.

(e)     Any applicable ad valorem or other similar taxes that are imposed on a periodic basis with respect to the Drilling Units, shall be prorated between the Seller and the Buyer. The Seller shall be responsible for the amount of taxes for the year including the Closing Date (or, in the case of such taxes determined on an arrears basis, the amount of such taxes for the immediately preceding period) multiplied by a fraction the numerator of which is the number of calendar days in the portion of the period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire period. The Buyer shall be responsible for the amount of such taxes for the year including the Closing Date (or, in the case of such taxes determined on an arrears basis, the amount of such taxes for the immediately preceding period) multiplied by a fraction the numerator of which is the number of calendar days in the portion of the period beginning after the Closing Date and the denominator of which is the number of calendar days in the entire period.

(f)     Occasional Sale. The transfer of the Drilling Units to Buyer is not made in Seller's regular course of business (as defined under La. Rev. Stat. Ann. Section 47:301(1)), and therefore, is considered an occasional sale and not subject to sales or use tax in the applicable taxing jurisdiction. However, the parties recognize that, although they believe the sale is not subject to sales or use tax, should such tax be applicable or assessed by any state against either party, the parties agree that Buyer shall be liable for any such tax assessed.

(g)     Sale of the Drilling Units shall be on an "AS IS, WHERE IS" basis, without any obligation whatsoever on the part of Seller to jack down, load-out, make any pre-transport preparations, or transport the Drilling Units from their current location in the Gulf of Mexico, South Timbalier Block 32 (the "Drilling Unit Location"), to a different location, and without any obligation on the part of Seller to incur any costs or expenses whatsoever associated with removing and transporting the Drilling Units. In accord with Section 9(a) below, Seller makes no warranties, and specifically disclaims any such warranties, that any machinery, equipment, structural component, slings, straps, cables, hoists, shackles, and/or other safety equipment that may be found on the Drilling Units are in a condition in which they can be used during any operation to make ready or transport the Drilling Units, and Buyer assumes all risk of loss associated with the use of any such items.

3.         Closing.

(a)     The Closing shall occur at Seller's offices (or at such other location or by electronic means if agreed upon by the Parties) on or before May 12, 2021 (the date on which such Closing ultimately occurs shall be referred to as the "Closing Date"), unless



2

otherwise agreed by Seller. This Agreement shall be terminated without further action or liability on the part of either Party, or any other recourse whatsoever, if Buyer fails to pay the Purchase Price on the Closing Date.

(b)     Prior to the Closing Date, Seller will deliver Seller's signed commercial invoice and bank instructions to Buyer and will deliver to Seller's representative the following "Closing Documents" which are to be held in trust until such time as the Seller confirms receipt of Buyer's wire transfer payment, at which time the Closing Documents will be provided to Buyer: (1) an original signed and notarized Bill of Sale for each Drilling Unit, substantially in the form attached hereto as Exhibit A, and warranting that each such Drilling Unit is free and clear from all mortgages, liens and other encumbrances; (2) an executed Protocol of Delivery and Acceptance for each Drilling Unit substantially in the form attached hereto as Exhibit B; (3) Technical or regulatory documentation pertaining to the Drilling Units that are in Seller's possession; and (4) a certified copy of the resolutions of the boards of managers of the Seller authorizing the execution of this Agreement and the sale of the Drilling Units.

4.     Delivery and Removal from the Drilling Unit Location.

(a)     Delivery shall be deemed to be made to Buyer at the Drilling Unit Location upon the Closing ("Delivery").

(b)     Upon Delivery, Buyer shall assume, at Buyer's sole cost, complete responsibility for compliance with all laws and regulations arising from or relating to the Drilling Units, the removal of the Drilling Units from the Drilling Unit Location, and the subsequent transportation of the Drilling Units by Buyer.

(c)     It shall be Buyer's sole responsibility to obtain, and pay the cost of obtaining, any consents, permits, licenses, insurance, or other authorizations necessary or desirable for the transportation of the Drilling Units from the Drilling Unit Location and for the transfer of the Drilling Units to Buyer.

5.     Risk of Loss. It is the express intention of the Parties that all risk of loss or damage and liability arising out of the ownership, use, operation or condition of the Drilling Units beginning as of the time the Purchase Price is received by Seller's Bank via wire transfer (as is shown by the records of Seller's Bank) and continuing thereafter shall be borne in total by Buyer. Prior to Closing, the Drilling Units shall be and remain in the possession of and at the risk of Seller, subject to the terms of this Section 5. In the event of an actual total loss or constructive total loss of either of the Drilling Units prior to Closing, this Agreement shall be terminated as to such Drilling Unit (with each Drilling Unit being valued at $361,900 (GAEA 3) and $365,680 (GAEA 6) without further action or liability on the part of either Party. If any damage to one or more of the Drilling Units occurs before Closing which does not result in such Drilling Unit being declared an actual or constructive total loss, Buyer may either (1) terminate this Agreement as to such Drilling Unit, or (2) if the Parties can agree, reduce the Purchase Price by an agreed sum. Buyer agrees that after the Closing Date, Seller shall have no obligation to insure, inspect, secure, or maintain the Drilling Units and that Buyer shall be solely responsible for placing its own insurance thereafter.



ATTACHMENT 1A

6.      NOT USED

7.      Seller Operating Documents. The Parties hereby agree that any records, Seller manuals, reports and other internal Seller documents ("Seller Operating Documents") with respect to the Drilling Units shall be the property of Seller and may be removed from the Drilling Units by Seller prior to Closing. Excluding Seller Operating Documents, any plans, specifications, manuals, drawings, and inspection and maintenance records with respect to the Drilling Units and its equipment that are currently on board the Drilling Units shall remain on the Drilling Units and become the property of Buyer after Closing.

8.      Seller Representations. Seller makes the following representations and warranties:

(a)     This Agreement constitutes the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms.

(b)     Seller is a limited liability company duly organized and validly existing under the laws of Texas.

(c)     Seller warrants it has good, valid and merchantable title to the Drilling Units and at the time title passes to Buyer at the Closing of this sale, that the Drilling Units will be free and clear of any and all mortgages, security interests, debts, liens, and encumbrances of any kind or type whatsoever.

9.      Title; Disclaimer of Certain Warranties. Seller makes, and Buyer agrees to, the following transfer of title and corresponding disclaimers of warranties, all of which survive Closing:

(a)     EXCEPT FOR THE WARRANTY OF LIEN FREE TITLE, THE DRILLING UNITS ARE BEING SOLD "AS IS, WHERE IS" WITH NO OTHER WARRANTIES WHATSOEVER OF ANY KIND WHATSOEVER, INCLUDING BUT NOT LIMITED TO WARRANTIES AS TO CLASS, CONDITION, SEAWORTHINESS, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, MATERIALS AND/OR WORKMANSHIP, AND SELLER SPECIFICALLY DISCLAIMS THE SAME. BY PURCHASING THE DRILLING UNITS AFTER HAVING INSPECTED THEM ON MAY 21, 2020, BUYER AGREES THAT IT IS FULLY SATISFIED WITH THE CONDITION OF THE DRILLING UNITS AND THAT BUYER SHALL HAVE NO RIGHT TO MAKE ANY CLAIM OF ANY KIND WHATSOEVER AGAINST SELLER UNDER ANY THEORY WHATSOEVER (INCLUDING WITHOUT LIMITATION THEORIES OF NEGLIGENCE, UNSEAWORTHINESS, OR BREACH OR WARRANTY), BASED IN WHOLE OR IN PART ON ANY ALLEGED DEFICIENCY IN THE CONDITION, DESIGN, FITNESS OR SUITABILITY OF THE DRILLING UNITS AND/OR THEIR EQUIPMENT AND/OR APPURTENANCES.



4

ATTACHMENT 1A

(b)     THIS IS THE FINAL, ENTIRE AND EXCLUSIVE EXPRESSION OF THE AGREEMENT OF THE PARTIES WITH RESPECT TO WARRANTIES AND REPRESENTATIONS AND THIS AGREEMENT SUPERSEDES ALL PRIOR REPRESENTATIONS AND UNDERSTANDINGS BY AND BETWEEN THE PARTIES, THEIR AGENTS, BROKERS AND REPRESENTATIVES.

10.     <u>Buyer Representations</u>. Buyer makes the following representations and warranties:

(a)     This Agreement constitutes the valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

(b)     Buyer is a limited liability company duly organized and validly existing under the laws of Delaware.

(c)     Buyer is purchasing the Drilling Units for the purposes of scrapping, recycling, or otherwise disposing of the Drilling Units. Buyer agrees that it shall not operate, use, sell (except as otherwise related to Buyer's scrapping, recycling or disposal operations), trade, or otherwise transfer the Drilling Units.

11.     <u>Indemnities</u>.

(a)     <u>Seller's Indemnity</u>. SELLER AGREES TO BE RESPONSIBLE FOR, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS BUYER, ITS SUBSIDIARIES AND AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS, AND INSURERS ("<u>BUYER PARTIES</u>") FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, COSTS AND CAUSES OF ACTION (INCLUDING REASONABLE ATTORNEY'S FEES, COURT COSTS AND EXPENSES) MADE AGAINST THE DRILLING UNITS OR, ALTERNATIVELY, AGAINST BUYER PARTIES WHICH RELATE TO OR ARISE OUT OF: (I) SELLER'S, OR ITS SUBSIDIARIES OR AFFILIATES, POSSESSION AND USE OF THE DRILLING UNITS OR THEIR OWNERSHIP AND OPERATION INCURRED OR LEVIED BY ANY PERSON, ENTITY OR GOVERNMENTAL AUTHORITY, INCLUDING BY ANY SELLER PARTIES, PROVIDED THAT SUCH CLAIM, DEMAND, COST OR CAUSE OF ACTION ARISES FROM EVENTS WHICH OCCUR OR ARE DEEMED TO HAVE OCCURRED PRIOR TO THE TRANSFER OF RISK OF LOSS AS PROVIDED IN SECTION 5; OR (II) ANY BREACH OF ANY OF THE REPRESENTATIONS, WARRANTIES OR COVENANTS OF SELLER CONTAINED IN THIS AGREEMENT.

SELLER SHALL DEFEND, INDEMNIFY AND HOLD BUYER HARMLESS FROM AND AGAINST ANY AND ALL DAMAGES ARISING OUT OF OR

5



ATTACHMENT 1A

RELATING TO ANY TAXES FOR WHICH SELLER IS RESPONSIBLE UNDER SECTION 2 ABOVE.

(b)  Buyer's Indemnity. BUYER HEREBY AGREES TO BE RESPONSIBLE FOR, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS SELLER, ITS SUBSIDIARIES AND AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS, AND INSURERS ("SELLER PARTIES") FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, COSTS AND CAUSES OF ACTION (INCLUDING REASONABLE ATTORNEY'S FEES, COURT COSTS AND EXPENSES) MADE AGAINST THE DRILLING UNITS OR, ALTERNATIVELY, AGAINST SELLER PARTIES WHICH RELATE TO: (I) BUYER'S, OR ITS SUBSIDIARIES OR AFFILIATES, POSSESSION AND USE OF THE DRILLING UNITS OR ITS OWNERSHIP AND OPERATION INCURRED OR LEVIED BY ANY PERSON, ENTITY OR GOVERNMENTAL AUTHORITY, INCLUDING BY ANY BUYER PARITES, PROVIDED THAT SUCH CLAIM, DEMAND, COST OR CAUSE OF ACTION ARISES FROM EVENTS WHICH OCCUR OR ARE DEEMED TO HAVE OCCURRED AFTER THE TRANSFER OF RISK OF LOSS AS PROVIDED IN SECTION 5 (INCLUDING BUT NOT NECESSARILY LIMITED TO ANY EVENT OF POLLUTION OR THE PRESENCE OF ANY NORM); OR (II) ANY BREACH OF ANY OF THE REPRESENTATIONS, WARRANTIES OR COVENANTS OF BUYER CONTAINED IN THIS AGREEMENT.

BUYER SHALL DEFEND, INDEMNIFY AND HOLD SELLER HARMLESS FROM AND AGAINST ANY AND ALL DAMAGES ARISING OUT OF OR RELATING TO ANY TAXES FOR WHICH BUYER IS RESPONSIBLE UNDER SECTION 2 ABOVE.

(c)  Application of Indemnities. ALL OF THE INDEMNITIES AND ALLOCATIONS OF RISK CONTAINED IN THIS SECTION 11 OR ELSEWHERE IN THIS AGREEMENT SHALL APPLY (TO THE EXTENT PERMITTED BY LAW) NOTWITHSTANDING THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY PERSON OR PARTY, STRICT LIABILITY, LIABILITY IMPOSED BY STATUTE, OR ANY OTHER BREACH OF OBLIGATION OF ANY PERSON OR ANY OTHER EVENT OR CONDITION. INDEMNITEES SHALL BE ENTITLED TO REASONABLE ATTORNEYS' FEES INCURRED IN ASSERTING OR ENFORCING THE INDEMNITIES GRANTED HEREIN.

(d)  Limitation of Liability. IN NO EVENT SHALL SELLER OR BUYER BE LIABLE TO EACH OTHER FOR SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES, WHETHER ARISING UNDER CONTRACT, WARRANTY, TORT OR ANY OTHER THEORY OF LIABILITY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR SUCH DAMAGES ARE FORESEEABLE.

12.      Time is of the Essence. All stipulations as to time are strictly of the essence.



6

13.        Survival.  The terms and conditions herein shall not merge on the Closing, but shall survive the Closing and remain in full force and effect and be binding on Seller and Buyer thereafter.

14.        Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable, and such provision shall be applied so as to give effect to the intent of such provision to the fullest extent possible.

15.        Opportunity to Consult with Attorney. Each of the Parties acknowledges that it has had the opportunity to consult with an attorney of its own choosing regarding the subject matter of this Agreement, that the terms hereof have been negotiated, and that if called on to interpret this Agreement, no court or other tribunal shall apply any rule which construes any ambiguity against one Party on the ground that it primarily or exclusively drafted this Agreement or the term in question.

16.        Broker's Fees or Commissions. Buyer shall have no liability whatsoever for the payment of any commission or brokerage fee to any broker or agent employed by Seller, including the fees of Mitchen Anderson Group LLC.  Seller agrees to indemnify and hold harmless Buyer from and against all loss, cost, damage, or expense arising out of claims for any fees or commissions of brokers or agents employed or alleged to have been employed by Seller in connection with the sale and purchase of the Drilling Units as provided for herein.

17.        Expenses. Except as otherwise expressly provided herein, each Party hereto will bear its respective costs and expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated herein or therein, including without limitation all fees and expenses of agents, representatives, counsel and accountants.

18.        No Waiver. No failure by any Party to insist upon the strict performance of any provision of this Agreement may be construed as depriving that Party of the right to insist on strict performance of that provision or of any other provision in the future, and no waiver may be deemed to have been made unless made expressly in writing and signed by a Party.

19.        Assignment. Buyer shall not assign this Agreement without Seller's prior written approval which approval may be granted or withheld in Seller's sole but reasonable discretion.

20.        Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the Party to be notified, (b) at the time of electronic confirmation of receipt if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) three days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) on confirmation of receipt from a nationally recognized private delivery service such as DHL Federal Express or United Parcel Service. All communications shall be sent to the respective Parties at their

7



following address, or to such e-mail address. Facsimile number or address as subsequently modified by written notice given in accordance with this Section 20:

       If to Buyer:

           Alabama Shipyard, LLC Attn: Mr. Ames Lafferty 660 Dunlap Drive
           Mobile, AL 36602
           E-Mail: alafferty@alabamashipyard.com

       If to Seller:

           Offshore Equipment, LLC
           Attn: Mr. Josh Greenberg
           5110 San Felipe 82W
           Houston, TX 77056
           E-mail: joshgreenberg12@hotmail.com

21.       Governing Law. The Parties agree that this Agreement shall be governed by and construed in accordance with general maritime laws of the United States, and, to the extent such maritime laws are not applicable thereto, the laws of the State of Alabama. The Parties submit to arbitration in accordance with the Commercial Rules of the American Arbitration Association (the "AAA") (except as modified hereby), which rules are deemed to be incorporated by reference into this article. The seat of arbitration shall be Mobile, Alabama, USA. The arbitration tribunal shall consist of three arbitrators, one selected by each of the Parties and the third selected by the other two arbitrators. The prevailing Party in any litigation to enforce or interpret this Agreement shall be entitled to recover its reasonable attorneys' fees at trial and on any appeal.

22.       Counterparts. This Agreement may be executed in counterparts. Each such counterpart shall be deemed to be an original and all such counterparts shall together constitute one and the same instrument. Counterparts may be exchanged by facsimile or by electronic means with original copies to be exchanged as soon as practicable thereafter.

23.       Entire Agreement. This Agreement and the bill of sale, when entered into by Seller and Buyer, shall constitute the entire agreement between Seller and Buyer pertaining to the subject matter thereof and shall supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of Seller and Buyer, and there shall be no agreements or understandings between Seller and Buyer in connection with the subject matter thereof except as specifically set forth therein. Neither Seller nor Buyer has relied on any express or implied representation, written or oral, of any individual or entity as an inducement to enter into this Agreement.

*[Signatures on following page]*



8

ATTACHMENT 1A

IN WITNESS WHEREOF, the Seller and Buyer each execute this Rig Purchase and Sale Agreement as of the Effective Date.

**BUYER**

Alabama Shipyard, LLC

By: _____
Name: _Timothy A. DeLong_
Title: _CFO_

**SELLER**

Offshore Equipment, LLC

By _____
Name: _Joshua Greenberg_
Title: _Owner_

9

ATTACHMENT 1A

**EXHIBIT A**

**Form of Bill of Sale**

**ATTACHMENT 1A**

| | **BILL OF SALE** | |
|---|---|---|

**1. VESSEL NAME**

**GAEA 3**

**2. OFFICIAL NUMBER**

IMO Number
**8755455**

**3. NAME(S) AND ADDRESS(ES) OF SELLERS:/**

**OFFSHORE EQUIPMENT, LLC**
5110 San Felipe St.
Houston, TX  77056

3A. TOTAL INTEREST OWNED (IF LESS THAN 100%)    100       %

**4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH:**

**ALABAMA SHIPYARD, LLC**
660 Dunlap Drive
Mobile, AL 36602

4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED)       100    %

4B. MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP    ☐ TENANCY BY THE ENTIRETIES    ☐ COMMUNITY PROPERTY

☐ OTHER (DESCRIBE)

**5.  CONSIDERATION RECEIVED:**

(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

6.  I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE, IN THE PROPORTION SPECIFIED HEREIN.
The Vessel is sold "as is, where is" with no warranties except as to title and free and clear of all encumbrances as is more fully set forth below.

**7.  SIGNATURES OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S).**

**8.  DATE SIGNED**

May __, 2021

9.  NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED (E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)

10.  ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATHS.)

STATE:
COUNTY/PARISH:

ON MAY __, 2021,THE PERSON(S) NAMED IN SECTION 9 ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN CONTAINED.

NOTARY PUBLIC
MY COMMISSION EXPIRES_____
(DATE)

**WARRANTIES/APPURTENANCES/LIMITATIONS/EXCEPTIONS**

"As is, Where is" Sale.  The Vessel is sold on an "as is, where is" basis and Buyer accepts delivery of the Vessel from Seller in such condition.  Buyer warrants that it has made all inspections and inquiries that it has considered necessary as to the condition of the vessel. No representations or warranties, either expressed or implied, are made by Seller with respect to the maintenance, repair, condition, design, operation, seaworthiness, value, marketability, merchantability, usefulness or suitability for any purpose, of the Vessel, including without limitation, (a) any implied or expressed warranty of merchantability, (b) any implied or expressed warranty for fitness for a particular purpose, and (c) the absence of any defects, whether known or unknown, with respect to the Vessel. Except as otherwise expressly provided herein, Buyer and Seller intend that the Vessel is conveyed and transferred to Buyer, in its present condition and state of repair existing on this date, "as is" and "where is," with all faults.

**ATTACHMENT 1A**

| | **BILL OF SALE** | |
|---|---|---|
| **1. VESSEL NAME**<br><br>**GAEA 6** | **2. OFFICIAL NUMBER**<br><br>**IMO Number**<br>**8752908** | |

**3. NAME(S) AND ADDRESS(ES) OF SELLERS:/**

**OFFSHORE EQUIPMENT, LLC**
5110 San Felipe St.
Houston, TX 77056

**3A. TOTAL INTEREST OWNED (IF LESS THAN 100%)**   100   %

**4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH:**

**ALABAMA SHIPYARD, LLC**
660 Dunlap Drive
Mobile, AL 36602

**4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED)**   100   %

**4B. MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.**

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP    ☐ TENANCY BY THE ENTIRETIES    ☐ COMMUNITY PROPERTY

☐ OTHER (DESCRIBE)

**5. CONSIDERATION RECEIVED:**

(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

**6. I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE, IN THE PROPORTION SPECIFIED HEREIN.**
The Vessel is sold "as is, where is" with no warranties except as to title and free and clear of all encumbrances as is more fully set forth below.

**7. SIGNATURES OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S).**

**8. DATE SIGNED**

May ___, 2021

**9. NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED (E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)**

**10. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATHS.)**

STATE:
COUNTY/PARISH:

ON MAY ___, 2021 THE PERSON(S) NAMED IN SECTION 9 ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN CONTAINED.

NOTARY PUBLIC
MY COMMISSION EXPIRES_____
(DATE)

**WARRANTIES/APPURTENANCES/LIMITATIONS/EXCEPTIONS**

"As is, Where is" Sale.  The Vessel is sold on an "as is, where is" basis and Buyer accepts delivery of the Vessel from Seller in such condition.  Buyer warrants that it has made all inspections and inquiries that it has considered necessary as to the condition of the vessel. No representations or warranties, either expressed or implied, are made by Seller with respect to the maintenance, repair, condition, design, operation, seaworthiness, value, marketability, merchantability, usefulness or suitability for any purpose, of the Vessel, including without limitation, (a) any implied or expressed warranty of merchantability, (b) any implied or expressed warranty for fitness for a particular purpose, and (c) the absence of any defects, whether known or unknown, with respect to the Vessel.  Except as otherwise expressly provided herein, Buyer and Seller intend that the Vessel is conveyed and transferred to Buyer, in its present condition and state of repair existing on this date, "as is" and "where is," with all faults.

12

ATTACHMENT 1A

## EXHIBIT B

### FORM OF PROTOCOL OF DELIVERY AND ACCEPTANCE

## PROTOCOL OF DELIVERY AND ACCEPTANCE

### GAEA 3 (ex-Hercules 204)

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, as a duly authorized representative of OFFSHORE EQUIPMENT, LLC, a
Texas limited liability company, (hereinafter referred to as "**Seller**") by these presents does hereby,
on behalf of the **Seller**, sell, grant, convey and deliver to **ALABAMA SHIPYARD, LLC**
(hereinafter referred to as "**Buyer**"), all right, title and interest to the jack-up drilling rig *GAEA 3
(ex-Hercules 204)* (the "**Drilling Unit**") pursuant to the terms of that certain Rig Purchase and Sale
Agreement dated as of May 7, 2021 by and between **Buyer** and **Seller**, and that the undersigned,
as a duly authorized representative of **the Buyer**, does hereby, on behalf of the **Buyer**, accept
delivery of the **Drilling Unit**.

The **Drilling Unit**, located at GULF OF MEXICO, SOUTH TIMBALIER BLOCK 32, is hereby
delivered and accepted as of _____ hours local time on the ____ day of May 2021.

**OFFSHORE EQUIPMENT, LLC**　　　　　　**ALABAMA SHIPYARD, LLC**
**Seller**　　　　　　　　　　　　　　　　**Buyer**

By:_____　　　　　　By:_____

Name:_____　　　　　　Name:_____

Title:_____　　　　　　Title:_____

Witness:_____　　　　　　Witness:_____

Name:_____　　　　　　Name:_____

14

ATTACHMENT 1A

## PROTOCOL OF DELIVERY AND ACCEPTANCE

### GAEA 6 (ex-Hercules 202)

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, as a duly authorized representative of OFFSHORE EQUIPMENT, LLC, a Texas limited liability company, (hereinafter referred to as "**Seller**") by these presents does hereby, on behalf of the **Seller**, sell, grant, convey and deliver to **ALABAMA SHIPYARD, LLC** (hereinafter referred to as "**Buyer**"), all right, title and interest to the jack-up drilling rig *GAEA 6 (ex-Hercules 202)* (the "**Drilling Unit**") pursuant to the terms of that certain Rig Purchase and Sale Agreement dated as of May 7, 2021 by and between **Buyer** and **Seller**, and that the undersigned, as a duly authorized representative of the **Buyer**, does hereby, on behalf of the **Buyer**, accept delivery of the **Drilling Unit**.

The **Drilling Unit**, located at GULF OF MEXICO, SOUTH TIMBALIER BLOCK 32, is hereby delivered and accepted as of _____ hours local time on the ___ day of May 2021.

**OFFSHORE EQUIPMENT, LLC**
**Seller**

**ALABAMA SHIPYARD, LLC**
**Buyer**


By:_____

By:_____

Name:_____

Name: _____

Title:_____

Title: _____


Witness:_____

Witness:_____

Name:_____

Name: _____

15

# ATTACHMENT 2

# MASTER TIME CHARTER

# AGREEMENT ("MTCA")

ATTACHMENT 2

# MASTER TIME CHARTER AGREEMENT

This MASTER TIME CHARTER AGREEMENT entered into on this 5th day of October, 2021 by and between **ABR LOGISTICS, LLC ("COMPANY"), and ALABAMA SHIPYARD, LLC ("CLIENT").**

## WITNESSETH:

WHEREAS, CLIENT, from time to time, desires to Time Charter vessels from COMPANY, and

WHEREAS, COMPANY owns various vessels and also acts as the broker for the owners and/or operators of other vessels suitably equipped for CLIENT's activities which it, from time to time, desires to Time Charter to CLIENT;

NOW, THEREFORE, for and in consideration of the premises and the covenants herein contained, the parties hereto mutually agree as follows:

### Article 1 – Formation and Cancellation

This MASTER TIME CHARTER AGREEMENT (MASTER AGREEMENT) shall control and govern each SHORT FORM TIME CHARTER AGREEMENT (SHORT FORM, attached hereto as Exhibit A) entered into between CLIENT and COMPANY which incorporates this MASTER AGREEMENT by reference. CLIENT may from time to time, request from COMPANY price, availability, and delivery information of specific vessels by telephone or in writing. In the event a vessel is available and the price and delivery thereof are acceptable to CLIENT, COMPANY will issue a SHORT FORM to CLIENT. Each party may cancel the MASTER AGREEMENT upon the giving of a thirty (30) day prior written notice to the other, provided, however, that any unexpired SHORT FORM shall continue in effect subject to the terms and conditions hereof until expiration of the term specified in such SHORT FORM.

The term of any SHORT FORM shall begin upon delivery of said vessel by COMPANY to CLIENT at the location and at the time specified in the SHORT FORM and continue for the term(s) specified unless terminated by CLIENT upon written notice to COMPANY.

### Article 2 - Brokering of Vessels

Under this MASTER AGREEMENT, CLIENT may from time to time permit COMPANY to act as a broker and to provide marine vessels owned by third parties (the "Subcharter") for purposes of meeting the requirements of a SHORT FORM. OWNER shall not Subcharter without the express written authorization of CLIENT. The compensation to COMPANY for the Subcharter shall be inclusive of all charges and costs for the Subcharter and shall be subject to the terms and conditions of this MASTER AGREEMENT.

It shall be the responsibility of COMPANY to ensure that the owner of the Subcharter provides crews and vessels which are properly licensed and certified in accordance with applicable laws and regulations, and that all such vessels are staunch, seaworthy and are otherwise appropriate and suitable for the purposes for which they are being Subchartered. COMPANY shall be responsible for the payment of any fines or penalties or other costs, including costs of defense, incurred by CLIENT as a result of any failure by COMPANY to provide a Subcharter which meet these requirements.

### Article 3 - Charter

This MASTER AGREEMENT does not obligate COMPANY to charter a Vessel to CLIENT, nor does it obligate CLIENT to hire a Vessel from COMPANY on a time charter basis, but this MASTER AGREEMENT together with

any SHORT FORM signed by both COMPANY and CLIENT, shall govern the respective rights and duties of COMPANY and CLIENT regarding the charter or Subcharter of any vessel. This is a nonexclusive vessel rental contract, and no vessel shall be considered chartered or hired until same is delivered by COMPANY to CLIENT at the location and at the time specified in the SHORT FORM and shall continue for the term(s) specified unless terminated by CLIENT upon written notice to COMPANY.

### Article 4 -Delivery, Redelivery, Substitution and Vessel Condition

Each vessel shall be delivered to CLIENT at the time and place specified in the applicable SHORT FORM. Time is of the essence for such delivery. COMPANY shall exercise due diligence to see that each vessel is delivered and maintained in good running order and in a seaworthy condition. The vessel shall have valid documentation as required by the American Bureau of Shipping or other international classification society and the United States Coast Guard as applicable. COMPANY shall develop and maintain a security plan in compliance with the Maritime Transportation Security Act of 2002 and implementing regulations, and have the plan or a statement of exemption from a plan onboard each vessel under SHORT FORM as applicable.

Throughout the term hereof, COMPANY shall maintain in full force and effect on the vessel all required United States Coast Guard documents and Certificates of Inspection together with any other documents required of the vessel.

If the parties mutually agree, each vessel shall be surveyed before delivery and upon redelivery, expenses of said surveys shall be divided equally between CLIENT and COMPANY.

COMPANY may, at any time with the prior written consent of CLIENT, substitute a suitable replacement vessel, provided such substituted vessel is acceptable to CLIENT as to equipment, time and location and may be subject to surveys as noted in the preceding paragraph.

Redelivery at the port or place specified in the applicable SHORT FORM may be postponed for the duration of any voyage or operation in progress at the expiration of the SHORT FORM term and for any additional period reasonably necessary to effect redelivery. CLIENT shall pay the time charter hire, at the applicable SHORT FORM rate, for the entire period that redelivery is postponed or delayed.

CLIENT shall pay COMPANY for all fuel, lube and water on board the vessel at the time of delivery. COMPANY shall pay CLIENT for all fuel, lube and water on board the vessel at the time of redelivery. Quantities of fuel, lube and water shall be determined by the respective on and off charter surveys and will be reflected on the invoice for the vessel hire. Charter surveys/soundings, shall be shared equally by COMPANY and CLIENT. The prices for said fuel, lube and water shall be the prevailing price at the respective port of delivery and redelivery.

### Article 5 - Charter Hire

COMPANY shall bill CLIENT at the rates provided in each SHORT FORM at the address specified in Paragraph 24 hereunder, or such other address as CLIENT may, from time to time, designate in writing, at the end of each SHORT FORM. CLIENT shall pay COMPANY within ~~thirty (30)~~fifteen (15) days after receipt of an approved invoice. Payment shall be made in U.S. Dollars to COMPANY, or its assigns, at either the address specified in Paragraph 24 hereunder or such other place as COMPANY may designate in writing in the SHORT FORM.

In the event of a dispute of all or part of an invoice, the undisputed portion of said invoice shall be paid and only the disputed portion shall remain unpaid pending the resolution of the dispute. If any vessel is lost, payment shall be made up to and including the date of the loss. If the time of loss is uncertain, then hire shall be payable up to and including the day such vessel was last heard from.

ATTACHMENT 2

With respect to any payments against any of COMPANY'S invoices that include amounts due for any Subcharter, the payments are made in trust for the benefit of such Subcharter and COMPANY will assure that such amounts are paid to the Subcharter owner within 14 days of receiving the payment from CLIENT.

Except for such liens which arise from CLIENT's failure to pay COMPANY in breach of this MASTER AGREEMENT, COMPANY agrees to indemnify and hold CLIENT Group harmless from and against any and all claims and/or liens arising by state and/or federal law created and imposed on any property, including vessels, which is owned, lease, rented and/or chartered by CLIENT Group or the customer for whom CLIENT may be performing services, and/or any property interests of CLIENT Group or the customer for whom CLIENT may be performing services. COMPANY agrees to indemnify and hold harmless CLIENT of and from all liens created and imposed upon the vessel or upon any CLIENT property (except such liens as might arise out of the obligations imposed herein on CLIENT) as a result of the manning, operating, victualing, maintaining, supplying and navigating of the vessel.

CLIENT shall not create, incur, or permit any liens to be imposed upon any vessel chartered under this MASTER AGREEMENT.

The rate provided for in the SHORT FORM may be revised at the request of COMPANY, and upon the agreement of CLIENT, provided COMPANY demonstrates that the operating cost have increased due to causes attributable to CLIENT.

<u>Article 6 - Use Of Vessel</u>

CLIENT agrees to restrict the use of each vessel to the lawful movement of its supplies, equipment (including CLIENT's vessels whether owned or chartered), and other materials and personnel incidental to its operations in the inland and offshore waters of the U.S. Gulf of Mexico, unless otherwise provided in the applicable SHORT FORM and in waters where the vessel can be navigated and always lie safely afloat at all stages of the tide. The whole of the vessel shall be at CLIENT's disposal reserving proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, equipment, stores and fuel. For reasons of safety, the vessel shall not be used for live diving (also known as live boating).

CLIENT and COMPANY agree to comply with all laws, regulations and the vessel's U.S. Coast Guard Certificate of Inspection (COI) affecting the marine carriage and discharge of Noxious Liquid Substances (NLS) in bulk. CLIENT may not load or cause to be loaded on the vessel any bulk NLS not authorized by the vessel's COI, except and to the extent permitted by CLIENT's National Pollution Discharge permit. No discharge of NLS residue into the sea is permitted; and CLIENT agrees to indemnify, protect, defend and hold harmless COMPANY, the vessel, its registered owner(s), its master and crew, and their respective underwriters from and against the results of any breach by CLIENT of the aforesaid discharge prohibition. COMPANY shall not be required to clean the vessel's bulk tanks, and CLIENT shall, at its own expense, arrange for the cleaning of such tanks and for the removal and legal disposal of the resulting residues. CLIENT agrees to properly manifest all hazardous wastes and NLS wastes carried aboard the vessel and to comply with all paperwork requirements imposed by law as a result of such carriage.

The operation, navigation and management of the vessel shall be under the exclusive control and command of COMPANY. Subject always to the right of the master to determine whether a movement may be undertaken, the vessel will be operated, and services herein described will be rendered, at times as requested by CLIENT. COMPANY is an independent contractor, and neither it, nor its employees, nor the master or crew are servants, agents or employees of CLIENT, CLIENT being interested only in the completed performance of the services herein provided.

The master of each vessel, including the master of any Subcharter, shall determine whether operations requested by the CLIENT can safely be undertaken and whether his vessel is capable of undertaking or being employed to carry out the directions and orders of the CLIENT. The master, although either employed or appointed by the

ATTACHMENT 2

COMPANY, shall be under the general directions of the CLIENT as regards employment of the vessel and shall not unreasonably refuse any request to undertake operations or carry out any order or direction specified by CLIENT. From time to time, CLIENT shall furnish the master of the vessel with all requisite instructions and general sailing directions, and the master shall keep full and correct logs of the voyages and these shall be made available within a reasonable time upon the request of CLIENT.

### Article 7 - Non-Crewmember Subsistence

Food and bunking facilities, if any, for any personnel other than crew members shall be provided by COMPANY, subject to reimbursement by CLIENT, at the rate specified in the SHORT FORM.

### Article 8 - Duties of Master and Crew

COMPANY shall provide and pay for the master and crew of each vessel and shall victual, maintain, navigate and supply the vessel at its expense. The master and crew shall either be U.S. Coast Guard licensed and/or documented. The master shall prosecute the voyage with dispatch and shall render all reasonable assistance with the vessel's crew and equipment. The duties of the crew provided by COMPANY shall be limited to the maintenance and navigation of the vessel, and local unions or labor regulations permitting, the loading and discharging of supplies, materials, liquids, or other cargos laden aboard the vessel. CLIENT warrants that no licenses, permits, or other documents shall be required by the crew members participating in the loading and discharging of supplies, materials, liquids, or other cargoes. COMPANY shall not be required under any circumstances to load or discharge supplies or cargoes except as expressly herein above provided.

If the CLIENT has reason to be dissatisfied with the conduct of the master or officers, the COMPANY shall, upon receiving particulars of the complaint, investigate and, if necessary, make a change in the appointment or practice required to satisfy the CLIENT's legitimate concerns.

### Article 9 - Additional Equipment

CLIENT may install additional equipment aboard each vessel reasonably necessary in connection with its operations, provided that CLIENT shall obtain the written consent of COMPANY before making any structural changes or modifications, and provided that said installation shall be approved by the American Bureau of Shipping and/or the United States Coast Guard, when applicable. All equipment installed by CLIENT shall remain its property and shall be removed prior to redelivery, provided each vessel is restored to the same good order and condition as it was prior to the installation of equipment or structural change, all at CLIENT's expense. The vessel(s) shall remain on-hire at that rate set forth in the applicable SHORT FORM during any period of said installation, removal and/or modification.

### Article 10 - Client to Provide

CLIENT agrees to and shall provide and/or pay for:

A.   Necessary dunnage, uprights and shoring equipment for securing deck cargo; fuel, oil and lubricants; fresh water; cordage; replacement bulk and cargo hoses; and the loading and discharging of all cargoes except as provided in Article 8 herein; provided that CLIENT, at its option, may direct COMPANY to procure any or all of the above, subject to reimbursement by CLIENT for the costs thereof plus fifteen (15%) percent for handling.

B.   All permits, clearance expenses, customs fees and duties (import or otherwise), pilotage fees, wharfage, port charges, canal fees, dockage, safe berths, watchmen, fumigation, extermination (when applicable during international work scopes), and cleaning of cargo tanks that are used by

ATTACHMENT 2

CLIENT, disposal of waste oil generated by CLIENT and all costs incident to any of the above, and any taxes imposed by the country of registry of the vessel, imposed by any nation in which the vessel is required to work, agency fees and commissions incurred in connection with the assessment, levy or payment of any of the above, unless incurred by reason of delay or fault on the part of COMPANY, but excluding income taxes imposed by the country of registry of the vessel, franchise taxes, and personal property taxes imposed by the home port taxing agency.

C.      COMPANY employees are prohibited from entering cargo tanks for the purpose of cleaning such tanks. It is the responsibly of the CLIENT to have all cement, barite and liquid mud residue remaining in cargo tanks cleaned. CLIENT is to provide a professional person who has training in confined space areas, who has proper safety procedures for tank cleaning, and who can provide the proper equipment to do said cleaning.

### Article 11 – Company's Insurance

COMPANY agrees, at its sole cost and expense, to procure and continuously maintain in full force and effect throughout the term of this MASTER AGREEMENT and any SHORT FORM, with reliable insurance companies rated not less than "A", or equivalent, by A.M. Best, the insurance coverages as set forth in Exhibit B attached hereto and made a part hereof.

COMPANY agrees, at its sole cost and expense, to provide, for COMPANY's employees, a worker's compensation and/or employer's liability policy, and shall waive subrogation against CLIENT.

Prior to the commencement of any services by COMPANY pursuant to this MASTER AGREEMENT, COMPANY shall secure and deliver to CLIENT certificates, in duplicate, evidencing that the foregoing insurance coverages set forth in Exhibit B are in full force and effect.

COMPANY shall ensure by written contract that all Subcharters are covered by appropriate insurance not less than the amounts required of COMPANY in this MASTER AGREEMENT. All policies of insurance provided by the owner of such Subcharter shall, to the extent of the indemnity and release obligations expressly assumed herein by COMPANY and/or such Subcharter, (1) include the CLIENT Group (as defined below) as additional insureds without limiting coverage to liability "as owner of the vessel" and to delete any "as owner" clause or any other language purporting to limit coverage to liability of an insured "as owner of the vessel" (2) provide that underwriter's rights of subrogation against the additional insureds are waived, (3) provide that such policies of insurance are primary to all other insurance of CLIENT Group and that any "other insurance" clause is deleted. But all naming as additional insured, waivers of subrogation, and primary-insured statues will apply in favor of CLIENT Group only to the extent of indemnities given by COMPANY hereunder and during such time that the vessel(s) is/are working for, or is/are under the direction of CLIENT or its affiliates, subsidiaries or any entity for whom any of the aforementioned have employed the service of the vessel(s) named herein. CLIENT shall also be afforded Contractual Liability coverage by the owner of such Subcharter.

### Article 12 – Client's Insurance

CLIENT agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this MASTER AGREEMENT, and with reliable insurance companies, the following coverages:

A.      Comprehensive General Liability Insurance, including Contractual Liability Insurance, covering CLIENT's obligations under this MASTER AGREEMENT, with limits of $5,000,000.00 per occasion.

B.      All risks cargo and equipment insurance, in the full amount of all cargo and equipment of CLIENT

**ATTACHMENT 2**

and its affiliates, subsidiaries, and personnel carried aboard the vessel.

C.   Worker's Compensation and Employer's Liability coverage with **a minimum limit of** $1,000,000.00.

All deductibles under the foregoing insurances shall be for the account of CLIENT. The All Risks Cargo and Equipment Insurance and Contractual Liability Insurance policies shall name COMPANY, the vessel, its owner(s), operators, master and crew and their respective underwriters as Additional Assureds and shall waive subrogation against such additional assureds. It is understood and agreed that CLIENT's liability insurance shall exclude coverage for those risks assumed or insured by COMPANY in this MASTER AGREEMENT. CLIENT's worker's compensation and/or employer's liability policy shall waive subrogation against COMPANY, the vessel, its owner(s), operators, master and crew, and their respective underwriters. All of the aforesaid coverages shall provide that COMPANY receive thirty (30) days' notice of material change or cancellation.

Upon request, CLIENT shall secure and deliver to COMPANY certificates in duplicate evidencing that the foregoing insurances are in full force and effect. CLIENT may self-insure the foregoing insurances, unless and except as prohibited by law.

### Article 13 - Invalidation of Insurances

It is the intention of the parties hereto that all risks, incidents and claims, ordinarily and generally insurable in the trade, shall be, and are insured against under the Insurances provided for herein, or otherwise provided by the COMPANY and CLIENT of the vessel. It is agreed that should any act of CLIENT vitiate or invalidate any of the aforesaid policies of insurance, then CLIENT shall pay to COMPANY all losses, damages, and expenses sustained by COMPANY as a result thereof, and shall indemnify COMPANY and vessel's registered owner(s) against all claims and demands which arise and which would otherwise have been covered by such insurance. It is further agreed that, should any act of COMPANY vitiate or invalidate any of the aforesaid policies of insurance, then COMPANY shall pay to CLIENT all losses, damages, and expenses sustained by CLIENT as a result thereof and shall indemnify CLIENT and vessel's registered owner(s) against all claims and demands which arise therefrom and which would otherwise have been covered by insurance.

### Article 14 – Company's Indemnities

COMPANY HEREBY RELEASES, RELINQUISHES, AND DISCHARGES, AND SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS (i) CLIENT, ITS PARENT, SUBSIDIARY AND AFFILIATED OR RELATED COMPANIES, (ii) ITS AND THEIR CONTRACTORS AND SUBCONTRACTORS OF EVERY TIER, AND (iii) THE OFFICERS, DIRECTORS, AGENTS, CONSULTANTS, INVITEES, INSURERS AND EMPLOYEES OF ALL OF THE FOREGOING. (THE "CLIENT GROUP") AND ANY CUSTOMER FOR WHOM CLIENT IS PERFORMING SERVICES, FROM AND AGAINST ANY CLAIM INVOLVING (i) DAMAGE TO OR LOSS OF THE VESSEL OR ANY EQUIPMENT OR PROPERTY OF COMPANY GROUP (AS DEFINED BELOW), (ii) DAMAGE TO OR LOSS OF ANY SUBCHARTER OR ANY EQUIPMENT OR PROPERTY OF THE SUBCHARTER OWNER, HIS EMPLOYEES AND/OR THE CREW OF SUCH SUBCHARTER ("SUBCHARTER GROUP"), (iii) INJURY, ILLNESS, DISEASE OR DEATH OF ANY MEMBER OF COMPANY GROUP AND/OR (iv) INJURY, ILLNESS, DISEASE OR DEATH OF ANY MEMBER OF THE SUBCHARTER GROUP, AND NO MEMBER OF CLIENT GROUP SHALL HAVE ANY RESPONSIBILITY OR LIABILITY FOR ANY SUCH CLAIM, WHETHER GROUNDLESS OR NOT, AND WHETHER CAUSED IN WHOLE OR IN PART BY THE UNSEAWORTHINESS OF ANY VESSEL, OR THE SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE OR GROSS NEGLIGENCE OR FAULT OR STRICT LIABILITY, OF ANY MEMBER OF THE CLIENT GROUP, OR BY THE EQUIPMENT OR PROPERTY OF ANY MEMBER OF THE CLIENT GROUP.

COMPANY SHALL HAVE SOLE RESPONSIBILITY AND LIABILITY FOR THE CONTROL, CLEAN-UP AND REMOVAL OF AND SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS CLIENT GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF POLLUTION OR CONTAMINATION THAT RESULTS FROM SUDDEN AND/OR ACCIDENTAL SPILLS OF FUELS, LUBRICANT, MOTOR OILS, PIPE DOPE, PAINTS, SOLVENTS, BALLAST, BILGE, METALLIC OBJECTS AND/OR GARBAGE THAT (i) IS IN THE POSSESSION AND CONTROL OF ANY MEMBER OF VENDOR GROUP OR SUBCHARTER GROUP OR (ii) EMANATES FROM THE VESSEL OR ANY EQUIPMENT IN THE POSSESSION AND CONTROL OF ANY MEMBER OF VENDOR GROUP OR SUBCHARTER GROUP AT THE TIME OF THE DISCHARGE.

## ARTICLE 15 – Client's Indemnities

CLIENT HEREBY RELEASES, RELINQUISHES, AND DISCHARGES, AND SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS (i) COMPANY, ITS PARENT, SUBSIDIARY AND AFFILIATED OR RELATED COMPANIES, (ii) ITS AND THEIR CONTRACTORS AND SUBCONTRACTORS OF EVERY TIER, AND (iii) THE OFFICERS, DIRECTORS, AGENTS, CONSULTANTS, INVITEES, INSURERS AND EMPLOYEES OF ALL OF THE FOREGOING ("COMPANY GROUP") AND SUBCHARTER GROUP FROM AND AGAINST ANY CLAIM INVOLVING (i) DAMAGE TO OR LOSS OF ANY EQUIPMENT OR PROPERTY OF CLIENT GROUP, (ii) INJURY, ILLNESS, DISEASE OR DEATH OF ANY MEMBER OF CLIENT GROUP, AND NO MEMBER OF COMPANY GROUP SHALL HAVE ANY RESPONSIBILITY OR LIABILITY FOR ANY SUCH CLAIM, WHETHER GROUNDLESS OR NOT, AND WHETHER CAUSED IN WHOLE OR IN PART BY THE UNSEAWORTHINESS OF ANY VESSEL, OR THE SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE OR GROSS NEGLIGENCE OR FAULT OR STRICT LIABILITY,  OF ANY MEMBER OF THE COMPANY GROUP OR SUBCHARTER GROUP, OR BY THE EQUIPMENT OR PROPERTY OF ANY MEMBER OF THE COMPANY GROUP OR SUBCHARTER GROUP.

CLIENT SHALL HAVE SOLE RESPONSIBILITY AND LIABILITY FOR THE CONTROL, CLEAN-UP AND REMOVAL OF AND SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS COMPANY GROUP OR SUBCHARTER GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF POLLUTION OR CONTAMINATION THAT RESULTS FROM SUDDEN AND/OR ACCIDENTAL SPILLS OF FUELS, LUBRICANT, MOTOR OILS, PIPE DOPE, PAINTS, SOLVENTS, BALLAST, BILGE, METALLIC OBJECTS AND/OR GARBAGE THAT EMANATES FROM ANY EQUIPMENT PLACED ON THE VESSEL BY ANY MEMBER OF CLIENT GROUP AT THE TIME OF THE DISCHARGE.

## Article 16 - Consequential Damages

NOTWITHSTANDING ANY OTHER PROVISION OF THE AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY OR ITS GROUP BE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS OR EARNINGS OR FOR SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION, LOSSES DUE TO BUSINESS INTERRUPTION OR DIMINUTION IN VALUE OF THE ASSETS OR BUSINESS TO WHICH THEY RELATE) ARISING OUT OF OR RESULTING FROM OR IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY SHORT FORM, WHETHER OR NOT CLAIMED TO BE DUE TO SUCH PARTY'S OR ITS GROUP'S NEGLIGENCE (WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE OR PASSIVE). FURTHER, COMPANY SHALL PROTECT, DEFEND AND INDEMNIFY CLIENT GROUP FROM ANY SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES INCURRED BY SUBCHARTER GROUP (INCLUDING WITHOUT LIMITATION, LOSSES DUE TO BUSINESS

ATTACHMENT 2

INTERRUPTION OR DIMINUTION IN VALUE OF THE ASSETS OR BUSINESS TO WHICH THEY RELATE) ARISING OUT OF OR RESULTING FROM OR IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY SHORT FORM, WHETHER OR NOT CLAIMED TO BE DUE TO SUCH PARTY'S OR ITS GROUP'S NEGLIGENCE (WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE OR PASSIVE).

OWNER AND CLIENT ARE RESPONSIBLE TO THIRD PARTIES AS A MATTER OF LAW.  FOR PURPOSES OF THIS AGREEMENT, "THIRD PARTY" IS DEFINED AS ANY PERSON, PARTY, OR ENTITY NOT A MEMBER OF CLIENT GROUP, COMPANY GROUP, OR SUBCHARTER GROUP.

### Article 17 - Off-Hire

Should the vessel, for reasons not caused by CLIENT, break down, become inoperative, or unavailable to CLIENT (which shall not be deemed to include periods in which either the vessel is standing by awaiting instructions from CLIENT, or repairs and maintenance that can be performed without interfering with the operating requirements and/or continued movement of the vessel on behalf of CLIENT) for more than twenty-four (24) hours in any SHORT FORM, payment of hire shall cease for all time in excess of said period from the time the vessel is unable to perform until the vessel is again in a thoroughly efficient state to resume service.  COMPANY is allowed the time specified in the applicable SHORT FORM for maintenance and repairs to the vessel but shall coordinate such activity with CLIENT to least interfere with the operations of CLIENT.

COMPANY's liability to CLIENT as a result of the vessel breaking down or becoming inoperative shall be limited solely to the cessation of charter hire as set forth above in this Article.

### Article 18 - Safety

It is understood by the parties that COMPANY is an independent contractor and as such, COMPANY is responsible for ensuring its operations are conducted in a manner consistent with appropriate health, safety and environmental considerations.  COMPANY covenants, warrants and represents that all services provided by COMPANY hereunder shall operate in the safest manner possible, consistent with industry standards and in strict compliance with all applicable rules, regulations, statutes, policies, and procedures of any governmental authority which may have jurisdiction.  When on CLIENT's premises, COMPANY and its employees, agents, and subcontractors shall abide fully with all applicable CLIENT safety rules and regulations, including, but not limited to, CLIENT's Health, Safety and Environmental Policy requirements.

### Article 19 - Force Majeure

Neither COMPANY, CLIENT, the vessel, or their owner(s), operators, managers, or agents shall be liable to the others for any loss, damage, or delay of whatsoever nature resulting from a Force Majeure event, including but not limited to acts of God, strikes, labor disputes, hostilities, war, epidemic, quarantine, embargo, or for restraint of any government, rulers or people, or other causes beyond the reasonable control of the parties hereto.  It is understood and agreed that unusual or inclement weather preventing the operation of the vessel, while the vessel is otherwise available for service, shall not interrupt the vessel's charter hire.

### Article 20 - Failure to Perform

If, at any time after delivery of the vessel to CLIENT, CLIENT fails to perform any of its duties or obligations imposed under this MASTER AGREEMENT and any SHORT FORM, or if CLIENT is dissolved or adjudged as bankrupt or has a petition in bankruptcy filed against it, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for CLIENT, COMPANY may, without prejudice, to any other rights which it may have under this MASTER AGREEMENT or any SHORT FORM, withdraw and retake all vessels, wherever the same

may be found, without prior demand and without legal process, and for that purpose may enter upon any dock, pier, or other premises where any vessel may be found and take possession thereof, provided however that COMPANY shall be responsible for and assume all loss, damage, injury, death, or other costs associated with all self-help retakings. Any cargo aboard any vessels retrieved by COMPANY shall remain the property of CLIENT and shall be available to CLIENT for use and/or removal at all reasonable times.

### Article 21 - Salvage

All salvage and salvage towage shall, after payment of out-of-pocket expenses, awards to the master and crew, and charter hire due COMPANY during such salvage efforts, will be divided fifty (50%) percent to CLIENT and fifty (50%) percent to COMPANY.

### Article 22 - Assignment

Neither COMPANY nor CLIENT shall assign this MASTER AGREEMENT without the prior written consent of the other, which consent shall not be unreasonably withheld, provided that CLIENT may assign its rights hereunder to its parent, affiliate or subsidiary and COMPANY may assign its rights to payment hereunder to its creditors without such consent. However, no such assignment shall relieve the assigning party from any of its obligations hereunder.

### Article 23 - Nature of Charter

Nothing herein contained shall be construed as creating a demise of the vessel to the CLIENT, nor shall this MASTER AGREEMENT be considered as or apply to the bareboat charter of any barge or other vessel from COMPANY by CLIENT. If a bareboat charter is desired for any barge or other vessel, such will be covered by a separate agreement.

### Article 24 - Notices

The address of the COMPANY for sending notices under this MASTER AGREEMENT is:

ABR Logistics, LLC
P.O. Box 10
Belle Chasse, LA 70037
Attn: Hank Ton
Phone: (504) 616-2111

The address of the CLIENT for sending invoices under this MASTER AGREEMENT is:

Alabama Shipyard, LLC
660 Dunlap Drive
Mobile, AL 36602
Attn: Samantha Johnston
Phone: 251-307-1601

Any notices provided for herein shall be deemed to have been given at the time of mailing when sent by registered mail to the recipient at the address herein above stated.

### Article 25 - Law

This MASTER AGREEMENT shall be construed in accordance with the admiralty and maritime laws of the United States of America. CHARTERER warrants that it is a United States citizen for the purposes of Section 2 of the U.S.

Page 9 of 13

ATTACHMENT 2

Shipping Act.  It is specifically understood that should either party seek legal recourse to have the other party comply with and/or fulfill any of its legal obligations under this MASTER AGREEMENT, the prevailing party shall be entitled to recover all reasonable attorney fees and costs incurred in connection therewith.

### Article 26 – Headings

The preceding headings are for identification purposes only and are not intended to delineate the obligations or rights of the parties to this MASTER AGREEMENT.

### Article 27 - Severability

The provisions of this Agreement are separable and severable.  If any provision, item or application of this Agreement shall be deemed invalid, in whole or in part, such invalidity shall not affect other provisions, items or applications of this Agreement which can be given effect without the invalid provision, item or application.

### Article 28 – Integration

This MASTER AGREEMENT supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with any written SHORT FORM) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This MASTER AGREEMENT may not be amended except by written agreement executed by authorized representatives of both parties.

**IN WITNESS WHEREOF,** the parties hereto have caused this MASTER AGREEMENT to be executed by their duly authorized representatives, in duplicate originals, as of the day and year first above written.

WITNESSES:

COMPANY:
**ABR LOGISTICS, LLC**

By: _____

Name: John Sesco well

Title: Manager

CLIENT:
**ALABAMA SHIPYARD, LLC**

By: _____

Name: Tim DeLong

Title: CFO

**ATTACHMENT 2**

## Exhibit A - Short Form Time Charter Agreement

THIS CHARTER is entered into as of the ___ day of _____ 20___, between ABR LOGISTICS, LLC (COMPANY), authorized charter of the vessel described below (Vessel) and ALABAMA SHIPYARD, LLC (CLIENT).

Pursuant to the terms of that certain MASTER TIME CHARTER AGREEMENT, dated October 5, 2021 by and between COMPANY and CLIENT, the premises and covenants of which the parties hereto are familiar with and incorporate herein by reference, COMPANY hereby agrees to time charter vessel services for CLIENT and CLIENT agrees to hire the vessel subject to the following:

1.  CLIENT shall restrict use of vessel to the waters of the Gulf of Mexico.

2.  As used or specified herein, the following descriptions and rates shall be construed to be as set forth herein below:

| | | |
|---|---|---|
| A. | **VESSEL NAME:** | |
| | **VESSEL NUMBER:** | |
| B. | **AGREED VALUE OF VESSEL:** | |
| C. | **TERM:** | |
| C. | **DATE OR TIME OF DELIVERY:** | |
| E. | **PORT OR PLACE OF DELIVERY:** | |
| F. | **PORT OR PLACE OF RE-DELIVERY:** | |
| G. | **PORT OR PLACE OF REGISTRY:** | |
| H. | **CHARTER HIRE RATES AND FEES:** | |
| | Daily Charter Rate: | |
| | Meal Fee – Per Bunk: | |
| | Bunking Fee – Per Bunk: | |
| I. | **MOBILIZATION FEE:** | |
| J. | **DEMOBILIZATION FEE:** | |
| K. | **FUEL, LUBE, CORDAGE, ETC.** | |

3.  Is this a brokered vessel? (yes or no)_____.
    If yes, vessel is owned by: _____

4.  Special Provisions numbered _____ through _____, annexed hereto as Annex A, shall be deemed incorporated herein and shall constitute additional terms and conditions of this SHORT FORM.

**CLIENT:**                                    **COMPANY:**
**ALABAMA SHIPYARD, LLC**                       **ABR LOGISTICS, LLC**


By:_____              By:_____
Title:_____             Title:_____

Page 11 of 13

ATTACHMENT 2

### Exhibit B - Company's Insurance

Attached to and made a part of that certain
MASTER TIME CHARTER AGREEMENT by and between
ALABAMA SHIPYARD, LLC (CLIENT)
and
ABR LOGISTICS, LLC (COMPANY),
Effective October 5, 2021

COMPANY shall during the term hereof, procure and maintain at its own expense, on forms and with reliable insurance companies acceptable to CLIENT and authorized to do business in the state in which the work is to be performed hereunder, the following insurance coverages and minimum limits:

a)   STATUTORY WORKMEN'S COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE - which shall comply with the Workmen's Compensation Acts of all jurisdictions in which any work provided or services hereunder is or is to be performed and covering all of COMPANY's employees and agents; and which shall include coverage under the United States Longshore and Harbor Workers Compensation Act, as amended, endorsed to include operations on the Outer Continental Shelf and all such coverage shall have statutory limits, unless otherwise agreed; and such insurance shall be extended to include all Admiralty and Jones Act coverages and coverage under the Death on the High Seas Act and under the General Maritime Law, including claims for the unseaworthiness, maintenance and cure, with Marine and Voluntarily Compensation, to include coverages for masters and members of a crew of any vessel, including endorsements for transportation, maintenance, wages, and cure, with limits of One Million and no/100 Dollars (U.S. $1,000,000.00), all of which coverages shall be per occurrence, not in the aggregate.

The Worker's Compensation and Employer's Liability Insurance Policy or Policies shall be endorsed:

I.)   To provide for a Borrowed Servant and/or an Alternate Employer endorsement stating that any claim brought against CLIENT, its parent, subsidiary and affiliated companies, its joint venturers, co-lessees and their respective officers, directors, employees and insurers (CLIENT Group) asserting any claim as a borrowed servant made by any employee shall be treated as claims against COMPANY.

II.)   To provide for an In Rem endorsement, which shall provide that any claims In Rem against any vessel, equipment, property or property interests of CLIENT Group shall be treated as claim against COMPANY.

b)   COMPREHENSIVE GENERAL LIABILITY INSURANCE - which shall include products liability, completed operations, and broad form contractual liability coverage, which shall include all contractual liabilities and indemnities assumed herein by COMPANY, and shall have the watercraft exclusion deleted so as to cover all vessels not insured under a protection and indemnity policy; and shall have limits as follows:

| | | | |
|---|---|---|---|
| I.) | For Bodily Injury | $1,000,000 | any one occurrence and |
| | | $2,000,000 | in the aggregate |
| II.) | For Property Damage | $1,000,000 | any one occurrence, and |
| | | $1,000,000 | in the aggregate |

The Comprehensive General Liability Insurance Policy shall be endorsed to provide for an In Rem endorsement, which shall provide that any claims In Rem against any vessels, equipment, property or property interests of CLIENT Group shall be treated as claims against COMPANY.

Page 12 of 13

If the Comprehensive General Liability Insurance Coverage is written on a claims-made basis and is non-renewed or canceled, COMPANY shall purchase and provide an endorsement granting an Extended Reporting Provision. The extended reporting period shall not be less than thirty-six (36) months. If the Comprehensive General Liability Insurance Coverage is an occurrence policy, it shall contain a no sunset clause or similar provisions intending to cancel coverage on claims following any cancellation or non-renewal of such coverage.

c)   PROTECTION AND INDEMNITY INSURANCE (or its equivalent) – covering crew, employees of the OWNER, passengers, third parties, removal of wreck and/or debris and contractual liability containing a minimum limit of One Million and No/100 Dollars ($1,000,000) providing adequate navigation limits to perform all work and services contracted hereunder. P&I Deductible not to exceed $50,000. COMPANY may cover its obligation for loss of life or bodily injury to the crew of all vessels and other watercraft by extending the Workmen's Compensation and Employer's Liability Policy provided in a.) above.

All Protection and Indemnity Insurance Policies shall be endorsed to delete COMPANY's Limitation of Liability clauses sometimes found in Protection and Indemnity policies.

d)   HULL AND MACHINERY INSURANCE – for its owned vessels and vessels it subcharters, leases, hires or brokers including coverage against the risks of Strikes, Riots and Civil Commotion for an amount equal to the value of the vessel including all supplies and equipment aboard, Full Collision Liability Insurance subject to a total minimum limit of Five Million and No/100 Dollars ($5,000,000).

e)   UMBRELLA LIABILITY COVERAGE - with limits and serving to increase the limits of the above listed coverages to Ten Million and No/100 Dollars ($10,000,000), in excess of the coverage outlined in Sections a.), b.), c.), d.), (to the extent that d.) provides either collision or removal of debris coverage).

f)   POLLUTION LIABILITY COVERAGE - for pollution emanating from or caused by a vessel or vessels owned or operated by COMPANY with limits of not less than Five Million and No/100 Dollars ($5,000,000) per occurrence.

All policies required hereunder shall be endorsed to delete the other insurance provision of COMPANY's policies and to provide that all COMPANY's policies shall be primary and non-contributory insurance with respect to those risk and obligations assumed herein by COMPANY.

COMPANY shall assure that Section a) II coverage provided under this Section, which has territorial limits, shall have its territorial limits extended to include the Gulf of Mexico, including, but not limited to, state and federal (including the Outer Continental Shelf) waters.

All deductibles under the foregoing insurances shall be for the account of COMPANY. All of the aforesaid policies shall name CLIENT, its parent, affiliates and subsidiaries, in their capacity as CLIENTs of the vessel, as additional insureds and shall waive subrogation against such additional insureds and their underwriters. Such policies shall also provide that CLIENT shall receive not less than thirty (30) days notice of material change or cancellation for the aforesaid coverages.

Prior to the commencement of any services by COMPANY pursuant to this MASTER AGREEMENT, COMPANY shall secure and deliver to CLIENT certificates in duplicate evidencing that the foregoing insurance coverages are in full force and effect.